| | AUSA: | John Neal | Telephone: | (313) 226-9644 |
|---|---|---|---|---|
| AO 91 (Rev. 11/11)  Criminal Complaint | Special Agent: | Karly Wood | Telephone: | (269) 615-5595 |

# UNITED STATES DISTRICT COURT
### for the

## Eastern District of Michigan

| United States of America<br>v.<br>Jordan Broad | Case: 2:26−mj−30148<br>Assigned To : Unassigned<br>Assign. Date : 3/19/2026<br>Description: CMP USA V. SEALED<br>(DJ) |
|---|---|

Case No.

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 2024 - July 2025___ in the county of ___Oakland___ in the ___Eastern___ District of ___Michigan___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

Karly Wood - Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: ___March 19, 2026___

_____
Judge's signature

City and state: _Detroit, MI_

Kimberly G. Altman - Magistrate Jusge
_____
Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Karly J. Wood, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I have been a Special Agent with the Federal Bureau of Investigation (FBI) since November 2009.  As a Special Agent with the FBI, I am authorized, pursuant to 18 U.S.C. § 3502, to execute search warrants and to make arrests for violation of federal law.

2.      I am currently assigned to the FBI Detroit Division.  I have completed training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, and various other criminal laws and procedures.  My current duties include conducting investigations relating to financial crimes.

3.      This affidavit is in support of a criminal complaint and arrest warrant charging Jordan Broad with wire fraud, in violation of 18 U.S.C. § 1343.

4.      The information contained in this affidavit is based on my personal observations and investigations, as well as on reports and information which I received from other law enforcement officers and other individuals related to the investigation.  This affidavit contains information necessary to support probable

cause for this application and is not intended to set forth all the information known by me or the Government.

**Improper Payments from Impact Eleven, LLC to Broad and his Wife**

5.     Impact Eleven, LLC (the "Company") was formed in 2021 by its Founders: J.L, R.E, P.S., and S.M.  The Company assisted business and industry leaders with obtaining the skills and access they needed to engage in professional speaking opportunities.

6.     Broad was hired as the Chief Executive Officer (CEO) of the Company in 2021.  Broad earned a salary of approximately $400,000 per year.  As CEO, Broad was entrusted with the day-to-day business operations, decisions, and management of the Company under the Company's Operating Agreement.  Broad was not an owner or co-founder of the company.  He had no authority to open any bank accounts in the name of the Company or borrow any money in the name of the Company, unless those actions were approved by a majority of the Founders of the Company.

7.     In July 2025, the Founders discovered that Broad directed payments from the Company's bank and credit card accounts to himself and his wife, Ashley Gold Broad ("Ashley").  The payments were made from the Company to JRB Market Consulting, LLC, AKB Consulting, LLC and ashleygold.com.

8.   Broad is the Registered Agent for JRB Market Consulting, Inc, which has a mailing and business address of XXXX Tanbark St, Bloomfield Hills, MI.  Broad and Ashley purchased the home at XXXX Tanbark St, Bloomfield Hills, MI in 2006 and re-financed the home in September 2025.  Impact Eleven had no debt owed to JRB Market Consulting, Inc which would have necessitated payments.  JRB Market Consulting, Inc had no legitimate business relationship with Impact Eleven and was not an authorized vendor for the company.

9.   Ashley is the Registered Agent for AKB Consulting, Inc, which has a mailing address of XXXX Tanbark St, Bloomfield Hills, MI and a website of Ashleykbroad.com.  That website resolves to ashleygold.com, which is the website for Ashley's jewelry business.  Impact Eleven had no debt owed to Ashley or her business.  Neither AKB Consulting, Inc. nor ashleygold.com had any legitimate business relationship with Impact Eleven and were not authorized vendors for the company.

10.   Broad directed over 100 separate transactions between February 2025-July 2025 from the Company to his and Ashley's entities, totaling approximately $5,075,139.  While Broad paid approximately $1,066,901 back to the Company to attempt to conceal his fraudulent self-dealing, the net loss to the company, with fees and interest, totaled approximately $4,132,962.

11.     The principal means by which Broad transferred funds from the Company to the entities he and his wife controlled was through credit card transactions using the Company's credit cards.  The Company had an account with American Express ("AmEx Account"), on which several Company credit cards were issued.  The AmEx Account was in the name of the Company and was to be utilized solely for expenses related to the Company's business.  The AmEx Account was personally guaranteed by the Founders.

12.     Broad utilized the AmEx Account to make many payments to JRB Market Consulting, ashleygold.com and AKB Consulting.  The payments were disguised as vendor payments through processing entities like Bill.com, Stripe, and SquareUp. The payments were recorded in the Company's books as payments to "bill.com", or "Stripe" or "SquareUp", which are payment services and do not provide goods or services to the Company.  Bill.com, Stripe and SquareUp send payments from the Company to a designated recipient and/or legitimate vendor. Therefore, when the Founders reviewed the financial records of the Company, they saw payments to bill.com, Stripe and SquareUp.  They did not see payments to JRB Market Consulting, Inc, AKB Consulting, or ashleygold.com.

13.     From July 2024-July 2025, Broad caused the Company, through credit cards tied to the Company's account, to make $4,001,845 in unauthorized payments to JRB Market Consulting and AKB Consulting.  Because payments to American

Express for these charges were made electronically from the Company's bank accounts in Michigan to American Express, which has its payment processing facility in California, there is probable cause to believe that Broad caused interstate wire transmissions in furtherance of his scheme to defraud.

14. In addition, and without approval, Broad caused a Company credit card to be issued in Ashley's name. Ashley had no role in the Company and was not authorized to have a Company credit card.

### Fraudulently Obtained Loan Agreements

15. In addition to the above, between April 2024 and July 2025, Broad entered into numerous loan agreements naming the Company as the borrower. Broad, in the Company's name, took out over $3 million in loans with nine different lenders. The proceeds of these loans were not utilized for any legitimate business purpose. Instead, they were used to pay both Broad's and Ashley's consulting companies. The Founders authorized none of these loans.

16. To obtain the loans while keeping them hidden from the Founders, Broad engaged in various deceptive practices. In some instances, Broad fabricated alleged consent resolutions that purported to make him the majority owner of the Company and therefore possessing authorization to borrow money on the Company's behalf. He also claimed on some loan applications to be a majority or

sole owner of the Company, and thus able to enter into loan agreements in the Company's name. He provided this false information to lenders who approved the loans based, in part, on these representations.

17.    In other instances, Broad made it appear to lenders that the Founders themselves had approved the loan applications, which they had not. Broad created fake e-mail addresses supposedly belonging to the Founders of the Company that, in fact, only Broad had control over.  Broad used those e-mail addresses to authorize electronic signatures of the Founders through DocuSign.  To lenders, it appeared as though the Founders of the Company had authorized the debts; when in fact, it was Broad acting without the Founders' knowledge or consent and forging their electronic signatures.

18.    The loan agreements pledged Company assets to secure the loans, which Broad did not have the authority to pledge. Broad concealed the loan agreements by sending information about them to his personal e-mail address and personal residential address.

### Attempts to Cover-Up the Fraud

19.    While he was diverting Company money for his own benefit through the above-described methods, Broad was also falsifying the company's financial statements to cover-up his embezzlement.

20.    Broad did not record the wrongfully obtained loans in the name of the Company as liabilities of the Company in its records.  He also fabricated financial statements by filling them with false information and presenting them as accurate to the Founders.

21.    For example, on July 20, 2025, Broad represented to the Founders that the Company had $930,000 excess cash available, and all its debts and vendors were paid and current.  These representations were false. On July 22, 2025, Founder J.L. received a phone call from the Company's bank stating the Company's account was overdrawn by $94,000.  J.L. contacted Broad, who was on a two-week family vacation to Africa.  Broad swore "on the lives of his children" that he did not steal money from the company.  J.L. immediately fired Broad for mismanaging Company funds and demanded that Broad no longer have any interaction with the Company.

22.    However, after he was terminated, Broad continued to access Company bank accounts, credit card accounts, and Company password storage accounts.  Broad changed passwords for accounts, which prevented the Founders from accessing credit card accounts and assessing the full financial damage Broad inflicted on the Company.

23. The Company was unable to pay Company employees, legitimate vendors, or unpaid balances with the lenders from whom Broad had obtained unauthorized loans. The Company was also responsible for approximately $500,000 in unpaid credit card charges, which led to freezes on the credit cards issued to the individual Founders and negative credit reporting on their accounts.

24. The Founders attempted to use their personal funds to inject cash into the Company and pay off a portion of the credit card debt. However, because of the scope of Broad's embezzlement scheme, the Company was forced to cease operations in August 2025. Twenty employees lost their jobs, and 350 paying customers were left with services not delivered.

## CONCLUSION

25. Therefore, based on the foregoing, I submit there is probable cause to believe that Broad violated 18 U.S.C. § 1343.

Karly J. Wood
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
presence and/or by reliable electronic means.

Hon. Kimberly G. Altman
United States Magistrate Judge        March 19, 2026